**Richmond.**

BURTON, &C. V. MILL AND ALS.

March 13, 1884.

1. WITNESSES—*Husband and wife—Competency.*—Where husband and wife are both parties, and interested in the result of a suit, neither is a competent witness.

2. FRAUDULENT CONVEYANCES—*What protected against.*—Code 1873, ch. 114, ¿ 1, protects against fraudulent transfer, all claims, debts and demands, including claims to damages for breach of contract to marry, for which judgment may, after the execution of the conveyance, be obtained.

3. IDEM—*Inconsistent reservations—Fraud on face.*—Deed of July 1st, 1873 (see opinion of Richardson, J.), an instance of a conveyance void for stipulations inconsistent with the grant, and for fraud manifest on its face.

4. SUBROGATION—*Its origin—Volunteers.*—The doctrine of subrogation rests not on contract, but on natural justice, and is enforced in behalf of sureties and others who are bound to pay for self-protection, but never in favor of mere volunteers. *Clevenger* v. *Miller*, 27 Gratt. 740.

5. THE HOMESTEAD EXEMPTION does not protect against a demand for damages for breach of promise to marry, which is not a *debt contracted*, but a *quasi* tort.

6. IMPROVEMENTS—*Allowance for.*—Under Code 1873, chapter 132, no allowance is made for improvements erected by one who is not a *bona fide* purchaser.

Appeal from decree of circuit court of King William county, rendered 2d October, 1880, in the chancery suit of Della P. Mill, suing for herself and other lien creditors of James I. Littlepage, against Robert H. Burton, James J. Littlepage, Edmund Littlepage, infant, Mrs. Mary J. Littlepage, S. G. Littlepage, trustee, B. A. Littlepage, trustee, and als., defendants. The object of the suit is to set aside and

annul three deeds made by James I. Littlepage, the first dated 21st June, 1872, to S. G. Littlepage, trustee, to secure debts to John L. and B. A. Littlepage; the second dated 1st July, 1873, conveying same property and all other property of grantor to B. A. Littlepage, trustee, for benefit of grantor's wife and children, and containing reservations to himself inconsistent with the grant; and the third, dated 19th January, 1876, conveying the same property to R. H. Burton, grantor's father-in-law, in pretended consideration of $2,500, and the release of certain debts of grantor which it was pretended said Burton held by assignment. The bill alleges that these deeds were made to hinder, delay and defraud the said Della P. Mill and other creditors of the grantor. The judgment of Della P. Mill is for $2,800, and was obtained 17th November, 1875, on a demand by her against James I. Littlepage for breach of his promise, made *anterior* to all of these deeds, to marry her. The defendants answered, denying all fraud. The cause was referred to a master, who, having taken evidence, reported that the deeds were fraudulent, except as to the balance of $200 on one debt of James I. to John L. Littlepage, which had been assigned to said Burton; which report, though excepted to, was confirmed by the circuit court, which decreed that the deeds aforesaid were void, for fraud; that they be set aside and annulled; and that the real estate attempted to be conveyed thereby be sold for the satisfaction of the said judgment. The evidence is voluminous, and the points raised numerous, and are sufficiently set forth in the opinion of the court. From said decree R. H. Burton and James I. Littlepage obtained an appeal to this court.

*J. N. Stubbs,* for the appellants.

*James Pollard, W. R. Aylett,* and *H. R. Pollard,* for the appellees.

RICHARDSON, J., delivered the opinion of the court.

Before considering the case on its merits, it is proper to dispose of the preliminary question respecting the competency as witnesses of James I. Littlepage and Mary J. Littlepage, his wife, both of whose depositions were taken and appear in the record, and were excepted to by the complainant.

The decree of the court below is not as full and clear as it should be, but the opinion of the judge who decided the cause appears at large and is part of the record. From it we get a full and clear view of the grounds upon which his decree is made to rest. Respecting the competency of these persons the learned judge says: "They occupy the relation of husband and wife, and are both interested in the result of this suit; they are, therefore, incompetent." It can only be necessary to read the recitals and stipulations in the deed of July 1st, 1873, from James I. Littlepage to B. A. Littlepage, trustee, in connection with the recitals in the subsequent deed of January 19th, 1876, from said James I. Littlepage and Mary J., his wife, and said B. A. Littlepage, trustee, to the defendant, R. H. Burton, to be impressed with the correctness of the conclusion arrived at by the judge of the circuit court. We are, therefore, of opinion that there is no error in said decree in that respect.

We come now to consider the exceptions to the report of the commissioner. They are three in number, only one of which need be noticed, the other two being repetitions, in effect, of the first; each of them being a simple declaration that the judgments reported were, respectively, not liens on the real estate in question. Said first exception involves the consideration of the whole case on its merits. It reads: "From the records in this cause the judgment of the plaintiff, rendered November term, 1875, is not a lien on the real estate in the bill and proceedings mentioned."

This is ostensibly a controversy between the complainant, Della P. Mill, and the defendant, R. H. Burton; when, in reality, it is a controversy between said complainant seeking to enforce a just demand, and James I. Littlepage, her debtor, who, through his wife, seeks to shelter his property in the hands of R. H. Burton under and by a fraudulent conveyance, to the exclusion of said complainant from her just rights.

The contention on the part of the appellant Burton is, that the judgment of the appellee, Della P. Mill, is not a lien on the real estate in question. The general terms in which the proposition is announced make it difficult to apprehend the true meaning, or the precise principle on which it is intended to rest. If the idea is that the conveyance from James I. Littlepage to a trustee for the benefit of himself and wife and children, though voluntary, is not, for that reason merely, void; or that the claim of said appellee, before the same was put in judgment, could not be asserted as against a *bona fide* purchaser for value without notice, then in either case the proposition is substantially correct. If, on the contrary, as would seem to be the case, the idea is that Mrs. Mill's claim, prior to the judgment thereon, was one that could not be enforced against the real estate in question under the circumstances of this case, then the proposition is wholly untenable, it being a case in which the deed is not only voluntary, but manifestly fraudulent, and made to hinder, delay, and defraud creditors, especially the said appellee, Della P. Mill. The well-settled general doctrine is that the statute protects as against a fraudulent transfer, any debts, claims or demands capable of enforcement. This principle is engrafted upon our statute, which declares that "every gift, conveyance, assignment, or transfer of, or charge upon any estate, real or personal, &c., &c., . . . . . and every bond or other writing given with intent to delay, hinder or defraud creditors,

purchasers, or other persons of or from what they are or may be lawfully entitled to, shall, as to such creditors, purchasers, or other persons, their representatives or as-signs, be void." § 1, ch. 114, Code 1873. The statute, by the words "other persons," clearly embraces others than those who are strictly and technically creditors. Mrs. Mill had, then, a lawful claim, capable of enforcement. Any conveyance subsequently made by James I. Littlepage, against whom such claim was, for the purpose of delaying, hindering or defrauding her in respect to the enforcement thereof, is as to such claim void, although such claim was not put in judgment, and did not assume the form of a debt, nor constitute here, technically speaking, a creditor, until after such conveyance.

It is important in this connection to look to the several conveyances in their chronological order, alleged to have been made to defraud the appellee, Della P. Mill. The first in order of these conveyances was that made by James I. Littlepage, on the 21st day of June, 1872, to Sutherland G. Littlepage, trustee, to secure to B. A. Littlepage a debt of $450, and purporting to secure to John L. Littlepage two debts due by bond—one of $700, due 1st January, 1870, and the other $750, due 1st day of January, 1872—the two amounting to the sum of $1,450, pretended to be thereby secured to said John L. Littlepage. This deed must have been made very soon after James I. Littlepage violated his marriage engagement with Mrs. Mill, whether that event occurred in 1871 or in 1872. As to the debt secured thereby to B. A. Littlepage, though by no means clearly a just debt, there is no controversy about it here, as the balance ($200) due thereon having been, by the court below, declared a valid lien in favor of the defendant, R. H. Burton, may be dismissed without further comment.

But as to the debts purporting to be secured thereby to John L. Littlepage, amounting to the large sum of $1,450,

said deed is unquestionably an unmitigated fraud. It satisfactorily appears from the evidence in the cause that no such debts nor any such bonds therefor, existed as are mentioned in said deed.

John T. Littlepage himself is introduced to sustain the defendant Burton's claim to these debts, pretended to have been assigned by him to said Burton. In his examinationin-chief he is asked the single question: "Please state whether or not on the 21st day of June, 1872 (the date of the deed in question), James I. Littlepage was indebted to you in the sum of $1,450 by bond or bonds; and if so, what was the consideration of said bond?" He answered: "Yes; he was on that day indebted to me in that amount by two bonds for money lent." On cross-examination when asked to give the dates and amounts of the bonds; where he resided in 1870 and in 1872; what business he was engaged in; what family he had; whether he was on a visit to Virginia at either of said dates; whether any part of the money was lent on the dates borne by the bonds; and to give the different amounts and dates on which the money was loaned, he answered, giving the dates and amounts specified in the said deed, and said that he resided in 1870 and 1872 in Philadelphia; that he was a builder, and had no family but himself; did not recollect whether he was on a visit to Virginia at either of the dates referred to, but visited backwards and forwards to Virginia during those times, and did not always take the bonds as he loaned the money, but sent some of it by letter to James I. Littlepage; did not recollect exactly whether any of the money was loaned at the dates of the bonds; and could not give the different amounts and dates at which the money was loaned, but stated that he could give some of the amounts; that $380 was loaned in Maryland in 1869; that the rest was lent in different sums at different times; that $200 was lent in Virginia at times

and places he could not recollect; and that the rest was loaned in sums of $5 and up; and that James I. Littlepage (his brother) had never made him any payments on money loaned.

When further pressed to tell when and where the settlements were made by ·which it was ascertained that his brother, James I. Littlepage, was indebted to him, as of the 1st day of January, 1870, in the sum of $700, and on the 1st day of January, 1872, in the further sum of $750; and for further particulars, he answered: that in 1872 his brother gave him a deed of trust to secure both bonds, and that he did not recollect whether the deed was given in Pennsylvania or Virginia. When asked what time in 1872 it was, he answered: "It was on the 21st day of June, 1872, the deed of trust was given." When the question was repeated, When were the bonds given? he answered: "One bond shows it was given in 1870, and the other in 1872, as I told you before." When by another question the witness was reminded that he was not asked what the bonds show, but, as a matter of fact, when the bonds were executed, he answered, "the bonds show for themselves the actual fact when they are dated." Then, when pressed to know if he intended to be understood as swearing that the two bonds were actually executed and delivered to him at their respective dates, the witness answered: "I can't say that they were delivered to me at that time." When asked when were they delivered to him, if ever, he answered: "I had them in 1876."

This witness goes on then and admits that he never saw the bonds in question until in February, 1876, when they were handed to him by his brother, James I. Littlepage; that it might have been a day, a week, or a month thereafter, but he thinks about a week thereafter, that he sold them to Burton, and that in the transaction James I. Littlepage acted as agent for Burton.

Then, when asked what consideration he received from Burton for said bonds, he answered: "Their value." And when asked what in dollars and cents that was, he comes out and admits that he did not receive any money, and has not since received any, but passed the bonds to Burton; that he, witness, was going to Cuba about that time and did not want to hold the bonds; that after his return from Cuba, to-wit: about the 12th day of August, 1879, he received the verbal promise of his brother, James I. Littlepage, that Burton would pay him for said bonds. This is all he has; and surely it would seem to be as much as bonds such as these, which have never been produced, and which in fact never had any real existence, could be worth. Yet these bonds, such as they are, constitute Burton's whole claim to a lien for the amount they are represented at in said deed.

Burton in his answer says that he paid $2,500 cash for the debts secured by this deed. John L. Littlepage, Burton's witness and the pretended assignor of Burton, says he has received nothing. One or the other statement is untrue. The fact is that this glaring contradiction, which is fatal to the claim of Burton, is made more glaring still by the deed subsequently made by B. A. Littlepage, trustee for James I. Littlepage and Mary J., his wife, and said James I. and Mary J. Littlepage to R. H. Burton, and by which the latter claims title to the property in question; for said deed recites that said $2,500 was paid in cash by Burton to James I. Littlepage himself. It is useless to pursue the subject further. The whole transaction, in its every feature, bears the unmistakable signs of deliberate fraud. It is therefore clear that said circuit court did not err in annulling and setting aside, as fraudulent and void, the said deed, in so far as it pretends to secure said debts to said John L. Littlepage.

The next conveyance in order, and now to be considered,

is the deed of the 1st day of July, 1873, by which James I. Littlepage conveyed to his brother B. A. Littlepage, not only all the property embraced in the previous deed just considered, but all other property of every description whatever owned by him, in trust for the use and benefit of said James I. Littlepage and wife, and any child or children they might have, and the education of such child or children, and upon the express stipulations that said trustee should permit the said James I. Littlepage to retain the possession and control of the property conveyed, and to apply the proceeds to the maintenance and support of himself and wife, and any child or children of theirs, and to the education of such child or children as aforesaid; that said James I. Littlepage, should he think it best, should have the right to sell any of said property, and that in the event of his doing so the said trustee, and his said wife, should join him in conveying the same; and upon the further stipulation, that if the said James I. Littlepage should die, leaving his said wife and a child or children surviving him, the said property should pass according to the statute of descents in Virginia; if his wife only should survive, then the said trustee or his successor should permit her to hold, occupy, use and enjoy the income from said property for her life, and at her death the whole to pass to the next of kin of the said James I. Littlepage; but if the said Mary J. Littlepage should die, leaving him, the said James I. Littlepage, and a child or children of theirs, surviving her, the trust to continue for their benefit; but in case the said James I. Littlepage only should survive her, the said Mary J., then the trust should cease, the said deed become null and void, and the whole of the property thereby conveyed to revert unrestricted to the said James I. Littlepage.

This is a remarkable paper. It in effect only secures the grantor's property to his own use and enjoyment. It was made at a time when the property (to say nothing of the

claim of Mrs. Mill) was largely encumbered by the trust deed of September 27, 1869, to secure John P. Johnson, no reference to or provision for the payment of which is made, although the use and control of the property conveyed is left absolutely to the will of the grantor. The deed is a sort of conditional declaration of insolvency. The trustee is the grantor's brother, and one of the beneficiaries in the prior deed of 21st June, 1872. It so directly and inevitably tends to hinder and delay creditors; was so palpably intended for that purpose, and so plainly violates the moral duty of honesty, as to stamp it on its face as fraudulent and void. Therefore the said circuit court did not err in decreeing the same to be fraudulent and void as to the claim of the appellee, Della P. Mill.

The next and last of this series of conveyances is the one of date the 19th day of January, 1876, purporting to be a deed of bargain and sale from B. A. Littlepage, trustee for James I. Littlepage and Mary J. Littlepage, and the said James I. and Mary J. Littlepage to the appellant, R. H. Burton. In this deed Robert H. Burton is not only a party in interest as grantee, but his name is signed thereto to give emphasis and effect to the consideration expressed on the face of the deed, as moving from R. H. Burton to the grantor, James I. Littlepage. After setting forth that a portion of the land thereby conveyed—to-wit: the tract of land known as "Lily Point"—was encumbered by the deed of trust of September 27, 1869, to secure the debt due from James I. Littlepage to John P. Johnson, which debt, with interest to the 19th January, 1876, amounts to $1,528.92, and that the said Johnson had transferred the said indebtedness and deed of trust to Robert H. Burton, "as appears by his endorsement thereon, dated the 13th day of April, 1874, and duly witnessed, thereby making the said James I. Littlepage the debtor of said Johnson to the amount of said sum of $1,528.92, as of the said 19th day of January,

1876, that being the amount, principal and interest, of the debt secured by the deed of trust of the 27th day of September, 1869, which deed of trust was by mistake and inadvertence released to said James I. Littlepage by deed from said Johnson and Roger Gregory, the trustee; which deed of release was, however, never acknowledged or recorded." Such is a literal transcript from the deed under consideration.

Then further setting forth that the grantor, James I. Littlepage, is unable to pay the indebtedness to Johnson, and, for lack of funds, unable to develop, operate, improve, or manage certain other properties (naming them) mentioned in the deed of July 1st, 1873, so as to derive any profits therefrom, and he, James I. Littlepage, deeming it best for all parties concerned to sell the whole, proceeds: " Therefore, this deed witnesseth, that for and in consideration of the above recited facts, as well as the sum of two thousand five hundred dollars *cash to him, the said James I. Littlepage, in hand paid by the said Robert H. Burton,* the recept whereof is hereby acknowledged, and the further sum of $1,528.92, the amount of the indebtedness of the said James I. Littlepage to the said Robert H. Burton, which he, the said Burton, hereby releases, as per his signature to and acknowledgment of this deed; they, the said B. A. Littlepage, trustee, and the said James I. Littlepage and Mary J. Littlepage, his wife, do hereby," &c.   This deed conveys the entire real estate in question to Robert H. Burton.   It is made in express recognition of authority reserved to the said James I. Littlepage by the prior deed of July 1st, 1873, and is so intimately connected with, and made to depend upon, said prior deed, that they seem to be almost one and the same transaction.   But however this may be, the deed to Burton was long subsequent to the rendition and docketing of the appellee Mill's judgment, which bound the land conveyed to Burton, and he took, in

any event, subject to the lien thereof. There is no error in the decree of the circuit court declaring this deed void as to said judgment.

As to the debts secured by the deed of trust of 27th September, 1869, which debts and the trust deed to secure the same, R. H Burton also claims, as the assignee of said Johnson; all of which is recited in the deed of 19th January, 1876, from B. A. Littlepage, trustee, and James I. and Mary J. Littlepage to R. H. Burton, last above considered, it is only necessary to say that the subject has been already sufficiently discussed incidentally. Suffice it now to say, there is no shadow of justice in the claim of Burton to be subrogated to Johnson's lien, (1) because it is abundantly clear that James I. Littlepage himself paid off and discharged this lien, and that Johnson, the beneficiary, and Roger Gregory, the trustee, in September, 1874, executed and delivered to said Littlepage a deed releasing said lien; and (2) the assignment of said trust deed, though purporting to have been made on the 14th of April, 1874, was, in fact, fraudulently obtained by James I. Littlepage some eighteen months later—to-wit: on the 25th day of October, 1875—was made without consideration, at a time when there was nothing left upon which the assignment could operate, and the unavoidable conclusion is, was obtained by said James I. Littlepage for the express purpose of defrauding the appellee, Della P. Mill, whose suit at law was then pending against said James I. Littlepage, and whose judgment was recovered therein very soon after said false and fraudulently procured assignment.

But, in addition, Burton's claim to be subrogated is, upon well settled principles, ill-founded. Taking as true his own story, he paid off Littlepage's debt as a mere volunteer. The doctrine of subrogation does not result from contract, but rests upon principles of natural justice. *Dering* v. *Earl of Winchelsea,* 1st Leading Cases in Equity,

100. It can only be enforced in behalf of sureties and others who are required to pay for their own protection, to subserve their own interests, and never in favor of mere volunteers. *Clevering* v. *Miller*, 27 Gratt. 741–2; *Bank of U. S.* v. *Winston*, 2 Brockenbrough's R. 252. In the latter case, Judge Marshall said: "There is no case in which the doctrine of subrogation has been enforced in favor of one not bound by the original contract who discharged it as a volunteer." Burton was not in any way or any sense bound by the original contract, but, according to his own admission, stepped in and voluntarily paid off the debt; and there is nothing to which he could be subrogated. If there had been any agreement between the creditor, Johnson, and Burton, that on his (Burton's) paying off the debts, he (Johnson) would assign them, that he did actually pay them, and the assignment was then and there actually made, the case would be very different, and Burton might then claim by subrogation the lien of said trust deed. But there is in the record no evidence that the bonds were ever assigned by Johnson to Burton; on the contrary, there is evidence going to show that the bonds were simply receipted or marked paid, and delivered by Burton to James I. Littlepage when the latter paid them. The bonds themselves, if produced, would have made all clear. It is admitted that the bonds were in the possession of James I. Littlepage. The commissioner notified said Littlepage that he would require their production; yet, when the time arrived Littlepage had absented himself and the bonds were not produced. When their production was so vitally important, and, after notification, they are not produced, what other conclusion can be arrived at than, if produced, they would not have shown that they had been assigned, as claimed? There is no real foundation in justice for Burton's claim to the lien in question; and the circuit court committed no error in rejecting it.

The next question for consideration is, as to the claim of homestead asserted in the court below and repeated here on behalf of James I. Littlepage. This claim was made as an alternative one, to protect said Littlepage to that extent in the event of his own acts and doings being declared fraudulent and the property attempted by him to be shielded from his just liabilities, held liable thereto. The claim, to say the least, cuts a poor figure when looked at from the standpoint of any supposed merit in the claimant as connected with the transactions under consideration.

The homestead provision in our constitution and laws was intended to give protection to the unfortunate as against " debts contracted," and not to fortify the crafty and designing against the consequences of their wrongdoing. It can in no just reason be said that the claim of the appellee, Della P. Mill, is that of a " debt contracted," within the meaning of the constitution and homestead law. 4 Minor's Ins. Part 1, p. 457; Bouvier's Law Dictionary, title Debt; *Whitacre, Sheriff* v. *Rector and Wife*, 29 Gratt. 714. On the contrary, the claim in question is, in its very nature, founded on a tort. The tortuous act, it is true, is referable to a contract—a contract of marriage, a contract essentially different in many respects from all others. The very language usually employed to designate the character of action—" an action for breach of contract of marriage"—necessarily imports that it is not an action on, but for the breach of, a contract; for which breach exemplary damages are allowable; in which respect the remedy is widely different from the case of ordinary actions on contract, in which the agreement between the parties controls the measure of remuneration. Sedgwick on Damages, 238. The same author at page 248 says: " To the general rule another exception also exists, that of breach of promise of marriage. In this action, though in form *ex-contractu,* yet, it being impossible, from the nature of the case, to fix

any rule or measure of damages, the jury are allowed to take into consideration all the circumstances; and, provided their conduct is not marked by prejudice, passion, or corruption, they are permitted to exercise an absolute discretion over the amount of compensation."

Mr. Minor, in his valuable work, says: " The breach of promise to marry so far resembles a *tort*, that the action is said not to survive against the promisor's personal representative nor in favor of the promisee's, unless special damage to the promisee's estate is alleged and proved." 1 Minor's Ins. 253; citing 1st Pars. Cont. 552–3; *Chamberlain* v. *Williamson*, 2 M. & S. 408, 416. The distinguished author states the proposition with evident caution, as well he might in the then state of the law in Virginia. Whatever doubt may have existed, however, has been removed by the decision of this court in the recent case of *Grubb's Adm'r* v. *Sult*, 32 Gratt. 203; in which it was for the first time decided by this court, that an action for breach of promise of marriage will not lie against the personal representative of the promisor, either at common law or under our statute (Code 1873, ch. 126, § 19), in a case where no special damages are alleged and proved. In delivering the opinion, Staples, J., said: " In the State of New York they have a statute substantially the same as ours, which was the subject of consideration in *Wade* v. *Kalbfleisch*, 58 N. Y. R. 282. It was there held that an action for a breach of promise of marriage is not an action upon a contract within the meaning of the statute, and cannot be revived against the personal representative of the promisor"; and quoting from the opinion of Church, C. J., further said: " The wrongs for which this statute authorizes an action to be brought by or against executors, are such as affect property or property rights and interests; or, in other words, such as affect the estate. Executors represent property only. They can take only such rights of action as affect property, and

cannot answer for injuries for personal wrongs. Although in form it resembles an action on contract, in substance it falls within the definition of the exception as an action on the case for personal injuries."

In no sense is the claim of the appellee, Della P. Mill, a "debt contracted" within the meaning of the constitution and homestead law. Nor can it be said with any show of reason that the framers of the constitution, by the homestead exemption, intended to give shelter and protection to evil-doers. We are, therefore, of opinion that the circuit court rightly rejected the claim of homestead.

As to the claim for improvements set up by the appellant, Burton, it is only necessary to say he is in no sense a *bona fide* purchaser, and upon well-settled principles his claim was properly rejected.

Upon the whole, we are of opinion there is no error in the decree of the court below; certainly none of which the appellants can complain, and the same must be affirmed with costs to the appellees.

DECREE AFFIRMED.